THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| HOPE INTERNATIONAL HOSPICE, INC., <br><br> Plaintiff, <br><br> v. <br><br> NET HEALTH SYSTEMS, INC., <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [34] DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT** <br><br> Case No. 2:22-cv-00656-DBB <br><br> District Judge David Barlow |

Defendant Net Health Systems, Inc. ("Net Health") moves to enforce a settlement agreement allegedly entered into with Plaintiff Hope International Hospice, Inc. ("Hope International") on March 27, 2023.[1] For the following reasons, the court grants this motion and denies Hope International leave to amend its complaint.

## BACKGROUND

Hope International provides hospice services, while Net Health offers software services to post-acute care providers.[2] The parties entered into a Subscription Agreement in 2013.[3] In October 2022, Hope International commenced this suit, alleging contract, tort, and unfair business practice claims.[4] This court dismissed each of Hope International's claims on March 9, 2023, and gave Hope International 60 days to seek leave to amend its complaint.[5]

---

[1] Def.'s Mot. to Enforce Settlement Agreement ("Mot. to Enforce"), ECF No. 34.
[2] Mem. Decision & Order 1, ECF No. 28.
[3] Pl.'s Mot. for Leave to File an Am. Compl. 2, ECF No. 31.
[4] Compl. 4–8, ECF. No. 2.
[5] Mem. Decision & Order 15.

On March 17, counsel for Hope International emailed counsel for Net Health, asking about the possibility of discussing "a mutual walk-away with each party to bear their own costs and fees, in exchange for [Hope International] waiving its right to an amendment or appeal."[6] Counsel for Hope International asked for Net Health's "thoughts" on such a proposal.[7] Counsel for Net Health replied on March 20, and stated that Net Health "would agree" so long as the dismissal was with prejudice.[8] On March 21, counsel for Hope International sent Net Health the proposed agreement—titled "Settlement Agreement and General Release of All Claims" ("Settlement Agreement")—motion, and order.[9] Counsel for Hope International asked counsel for Net Health to "redline and return any changes you might have. Otherwise, please return signed documents and we'll handle the filing."[10]

Under the Settlement Agreement it prepared, Hope International agreed to "release and absolutely and forever discharge NET HEALTH . . . from any and all claims . . . of every kind and nature whether now known or unknown" which it "now has, owns or holds or ever had, owned or held, or could, shall or may ever have" based on the parties' relationship.[11] Hope International also agreed to "waive any and all right to amend its complaint" or appeal the order granting Net Health's motion to dismiss.[12] Hope International also agreed to "file [a] Stipulated Motion to Dismiss with Prejudice" within five days of receipt of an executed Stipulation for Dismissal.[13] On March 27, counsel for Net Health returned the signed document without making

---

[6] Mar. 17 Emails 2, ECF No. 34-2.
[7] *Id.*
[8] Mar. 20 Emails 1, ECF No. 34-3.
[9] Mar. 21 Emails 1, ECF No. 34-4.
[10] *Id.*
[11] Settlement Agreement ¶ 2, ECF No. 34-6.
[12] *Id.*
[13] *Id.* at ¶ 5.

any revisions.[14] Hope International never signed the Settlement Agreement nor filed the Stipulated Motion with the court.

Instead, on March 30, counsel for Hope International called and then emailed counsel for Net Health regarding the possibility of adding a provision into the Settlement Agreement to ensure access to Hope International's data held by Net Health.[15] Counsel for Net Health replied on April 6 that Net Health had sold a piece of its business to Careficient, Inc. ("Careficient"), who was in possession of Hope International's data, and that Net Health was unable "to make any binding commitments about the availability of [Hope International's] data."[16] Counsel for Hope International contacted Careficient regarding the data and was informed that data could be accessed through either purchase of an annual subscription or by manually downloading PDF files for each patient.[17]

On May 8, Hope International filed a Motion for Leave to File an Amended Complaint.[18] In response, on May 17, Net Health filed the instant Motion to Enforce Settlement Agreement.[19] On June 9, Hope International filed its Opposition to Net Health's Motion to Enforce.[20] And on June 13, Net Health filed its Reply in Support of its Motion to Enforce.[21]

---

[14] Mar. 27 Emails 1, ECF No. 34-5.
[15] Mar. 30 to Apr. 7 Emails 2, ECF No. 34-7.
[16] *Id.* at 1.
[17] Careficient Emails 1–5, ECF No. 40-1.
[18] Pl.'s Mot. for Leave to File an Am. Compl. 2, ECF No. 31.
[19] Mot. to Enforce.
[20] Pl.'s Opp'n to Mot. to Enforce, ECF No. 40.
[21] Def.'s Reply in Support of Mot. to Enforce, ECF No. 42.

## JURISDICTION

At the outset, the court observes that it has subject-matter jurisdiction to decide the Motion. "[W]here . . . a party seeks to enforce a settlement agreement after the district court has dismissed the case, the district court lacks jurisdiction over the agreement unless the court either incorporated the agreement's terms into the dismissal order or expressly retained jurisdiction over the agreement."[22] "If, however, a party seeks to enforce a settlement while the underlying suit remains pending, then the district court has jurisdiction to enforce the related settlement."[23] The court previously dismissed the Complaint without prejudice and did not terminate the case.[24] As a result, the court has jurisdiction to decide the Motion.

## STANDARD

Federal trial courts have "the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it."[25] Thus, federal courts treat a motion to enforce a settlement agreement akin to a motion for summary judgment,[26] and will grant the motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[27]

---

[22] *T St. Dev., LLC v. Dereje & Dereje*, 586 F.3d 6, 11 (D.C. Cir. 2009).
[23] *Id.*; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378–82 (1994); *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993).
[24] ECF No. 28.
[25] *Hardage*, 982 F.2d at 1496 ("A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." (citing *Tiernan v. Devoe*, 923 F.2d 1024, 1031–32 (3d Cir. 1991); *Millner v. Norfolk & W.R. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981))); *accord Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004).
[26] *See Tiernan*, 923 F.2d, at 1031–32.
[27] Fed. R. Civ. P. 56(a). If there were genuine disputes of material fact that would affect the existence or enforcement of the agreement, the court would hold an evidentiary hearing. *See Hardage*, 982 F.2d, at 1496–97. No such disputes are present here, and neither party has requested such a hearing.

## DISCUSSION

Under Utah law,[28] "[s]ettlement agreements are governed by the rules applied to general contract actions."[29] The party alleging the existence of a contract bears the burden of proof.[30] Net Health argues that the parties entered into an enforceable contract, notwithstanding the fact that Hope International did not sign the Settlement Agreement.[31]

The "elements essential to contracts" include "offer and acceptance, competent parties, and consideration."[32] On March 21, Hope International sent Net Health the Settlement Agreement it prepared.[33] In the email accompanying the Settlement Agreement, Hope International asked Net Health to "return any changes you might have. Otherwise, please return signed documents and we'll handle the filing."[34] This was a clear and unequivocal offer to settle on the terms presented in the written Settlement Agreement. On March 27, Net Health returned the signed Settlement Agreement without making any revisions.[35] This constituted the acceptance of Hope International's proposed Settlement Agreement. The Settlement Agreement itself details the consideration.[36] Accordingly, the "essential elements" of a contract are all present: an offer by Hope International, an acceptance of that offer by Net Health, the consideration identified in the Settlement Agreement, and competent parties.[37]

---

[28] "Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Shoels*, 375 F.3d, at 1060. The parties do not dispute that Utah law applies.
[29] *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995).
[30] *See id.* at 1222.
[31] Mot. to Enforce 3–5.
[32] *Golden Key Realty, Inc. v. Mantas*, 699 P. 2d 730, 732 (Utah 1985).
[33] Mar. 21 Emails 1.
[34] *Id.*
[35] Mar. 27 Emails 1.
[36] Settlement Agreement ¶¶ 1–3, 5.
[37] Neither party addresses competency, but both parties are corporate entities and are represented by counsel.

In its Opposition, Hope International raises three issues: (A) whether the parties had a meeting of the minds sufficient to create an enforceable contract; (B) whether a definite offer was unconditionally accepted; and (C) whether the parties made a mutual mistake as to the ownership of Hope International's data that would render the alleged settlement agreement unenforceable.[38] The court addresses each in turn.

### A. Meeting of the Minds

"Under the principles of basic contract law, a contract is not formed unless there is a meeting of the minds" as to the "essential terms" of the contract.[39] Those "terms must be definite and unambiguous."[40] Hope International does not argue that the terms of the Settlement Agreement are indefinite or ambiguous. Instead, it argues that the parties did not reach a meeting of the minds on the settlement agreement because each party understood the terms of the settlement differently, with Hope International believing it would "retain access to its patient data" and Net Health being at least mistaken as to whether it possessed the data.

As noted earlier, Hope International offered to settle its dispute with Net Health on the terms contained in the Settlement Agreement, and Net Health accepted the Settlement Agreement.[41] The Settlement Agreement does not even contain the word "data," does not discuss patient data in any way, and certainly does not provide a basis for arguing that Net Health currently possessed patient data or that Hope International would have access to any such data. It is entirely silent on the issue. Instead, the Settlement Agreement clearly and succinctly states that

---

[38] Pl.'s Opp'n to Mot. to Enforce 2, 4–7.
[39] *Sackler*, 897 P.2d, at 1221, 1222.
[40] *Cea v. Hoffman*, 2012 UT App 101, ¶ 24, 276 P.3d 1178.
[41] *See supra* notes 33–35.

the parties waive any and all claims against each other.[42] The Settlement Agreement also plainly states that it constitutes the "entire understanding between the Parties," that it "fully supersedes any and all prior agreements," and that it cannot "be amended or modified in any respect whatsoever except by a writing duly executed by the Parties."[43] Hope International's "meeting of the minds" argument fails.

Hope International cites to *Sackler v. Savin*[44] in support of its position, yet *Sackler* is of no help. In *Sackler*, the parties entered into a partnership agreement for the purpose of operating a condominium unit for vacation rentals.[45] A dispute arose as to whether Savin could occupy the unit for his personal use, and if so, how much Savin owed Sackler for such use.[46] Savin, through counsel, proposed a settlement, under which he would pay the full rental value, minus 10%.[47] Counsel for Sackler responded with a purported acceptance, plus additional terms "regarding the sale of the unit and handling of partnership checks."[48] The parties continued to exchange communications regarding accounting related to Savin's use of the unit.[49] Eventually, it became clear that the parties were not in agreement on *who*—as between the partnership and Sackler—would be paid for Savin's use.[50] The Utah Supreme Court held that this precluded the formation of a contract, since "the parties had not come to an agreement on the essential terms of the contract."[51]

---

[42] Settlement Agreement ¶¶ 1–3.
[43] *Id.* ¶ 16.
[44] 897 P.2d 1217 (Utah 1995).
[45] *Id.* at 1218.
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 1219.
[50] *Id.* at 1219–20.
[51] *Id.* at 1221–22.

The situation here is entirely different. In *Sackler*, there was an agreement on the *amount* to be paid, but no agreement on *who* would be paid, a necessarily essential term of the contract. By contrast, here, nothing in the Settlement Agreement suggests that Hope International's access to data was an essential term. Indeed, the Settlement Agreement simply does not discuss data, possession of data, or access to data at all. The substantive terms included only settlement and release obligations,[52] which do not require agreement on control of Hope's data. Indeed, Hope's assertion that it "believed . . . that the release and waiver of any appeal would apply only if it had access to all data"[53] is entirely without support. In *Sackler*, the parties' silence on one term meant that there was no meeting of the minds on an essential term, but the same is not true here, since access to data is not a term, essential or otherwise, of the Settlement Agreement Hope International prepared and proposed to Net Health.

### B. Mutual Assent

Offer and acceptance—collectively termed "mutual assent"[54]—are essential elements to contract formation.[55] Utah follows the Restatement of Contracts' approach to offer and acceptance.[56] Thus, an offer is "a manifestation of willingness to enter into a bargain, so as made to justify another person in understanding that his assent to the bargain is invited and will conclude it."[57] "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous."[58] "An offeree's proposal of different terms from those of the

---

[52] *See* Settlement Agreement ¶¶ 1, 2, 3, 5.
[53] Pl.'s Opp'n 4.
[54] *Rasmussen v. U.S. Steel Co.*, 265 P.2d 1002, 1004 (Utah 1954); *accord Rapp. v. Salt Lake City*, 527 P.2d 651, 654 (Utah 1974); *Livingston v. Finco Holdings Corp.*, 2022 UT App 71, ¶ 14, 513 P.3d 94.
[55] *Cea*, 2012 UT App 101, ¶ 24 (citing *Golden Key Realty*, 699 P.2d, at 732).
[56] *See Eng'g Assoc., Inc. v. Irving Place Assoc., Inc.*, 622 P.2d 784, 787 (Utah 1980).
[57] *Id.* (quoting Restatement (Second) of Contracts § 24 (Am. L. Inst. 1981)).
[58] *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 2001 UT 91, ¶ 12, 34 P.3d 785.

8

offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally."[59] "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made."[60] Per the Restatement, preliminary negotiations while drafting a written agreement may not be sufficient manifestations of assent.[61] However, it "is a fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract."[62]

Hope International argues that there was no contract because there was an offer and a series of counteroffers with no definite acceptance of an offer or counteroffer.[63] In reply, Net Health argues it accepted Hope's offer by signing and returning the Settlement Agreement.[64]

Hope International first reached out to Net Health about the possibility of a mutual walk-away agreement and specifically asked for "thoughts" on the proposal.[65] Net Health replied that it "would agree" to a walk-away, so long as there was a dismissal with prejudice.[66] Not only is Hope's first communication too indefinite to constitute an offer but also, given the conditional language, it does not objectively indicate that Net Health could have accepted that communication and formed a binding contract. In addition, the verb "would" in Net Health's

---

[59] *Cal Wadsworth Const. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995).
[60] *Id.* at 1376.
[61] Rest. 2d Contracts § 27; *accord Sackler*, 897 P.2d, at 1221.
[62] *Ercanbrack v. Crandall-Walker Motor Co.*, 550 P.2d 723 (Utah 1976) (quoting 17 Am. Jur. 2d Contracts § 70 (1964)); *accord Livingston*, 2022 UT App 71, ¶ 16.
[63] Pl.'s Opp'n 5–6.
[64] Def.'s Reply 4–5.
[65] Mar. 17 Emails.
[66] *Id.*

reply indicates a future intention, as opposed to a present intention, to be bound.[67] Thus, on March 20, after this exchange, there was no contract, as there had yet to be any sufficiently definite manifestation of mutual assent.[68] And because there had been no sufficiently definite offer, Net Health's reply that any deal must include a term regarding dismissal with prejudice could not have been a counteroffer.

Next, Hope International sent an email containing the Settlement Agreement and asked for either redlines or a return of signed documents.[69] If Net Health chose to return signed documents without modification, Hope International stated that Hope also would "handle the filing."[70] Counsel for Net Health returned the signed documents without modification.[71] The written Settlement Agreement was sufficiently definite and unambiguous to constitute an offer; by inviting signature without modification, Hope International objectively manifested a willingness to enter into the bargain, such that Net Health was reasonably justified in assuming that its signature would conclude it. By signing and returning the document, Net Health objectively manifested assent to the agreement. That Hope International never signed the Settlement Agreement is immaterial,[72] since its actions evidenced an intent to be bound upon Net Health's signing. Thus, a contract was formed March 27, 2023.

---

[67] *See Would*, Merriam-Webster, https://www.merriam-webster.com/dictionary/would (last visited Aug. 22, 2023).
[68] *Cf. Park Prop. Mgmt. LLC v. G6 Hosp. Franchising LLC*, 2022 UT App 75, ¶¶ 20–31, 514 P.3d 148 (finding a binding contract existed when counsel for both parties exchanged emails stating definitively that the parties had agreed to the settlement offer, but where future written memorialization was contemplated).
[69] Mar. 21 Emails 1.
[70] *Id.*
[71] *Id.*
[72] There are Utah cases holding that a failure to sign a contract can prevent the formation of a contract based on a lack of mutual assent. *See Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, ¶ 17, 148 P.3d 983 (holding there was no contract to arbitrate when one party's name appeared one the cover page of the contract, but did not appear under a signature line, and he did not sign the contract). However, the facts here are distinguishable, since here the non-signing party was the drafting party and there was other evidence of assent.

Hope International then briefly argues that later emails about access to data show that no contract was formed.[73] Not so. As noted above, a contract was formed on March 27. Subsequent inquiries about issues not addressed by that contract do not undermine the agreement. Thus, contrary to Hope International's arguments, its subsequent inquiry into whether the parties could include a new term in the Settlement Agreement regarding access to data had no effect on whether a contract was formed.

### C. Mutual Mistake

"A party may rescind a contract when, at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract."[74] The party asserting mutual mistake has the burden of proving mutual mistake by clear and convincing evidence.[75] Hope International argues that even if a contract was formed, its access to its data was a basic assumption of the Settlement Agreement that justifies recission, since neither party knew whether Hope could access its data and "[t]his mistake is crucial to the parties' understanding of the claims they were waiving and the benefits they would receive from the settlement."[76]

First, Hope International fails to identify facts that would permit a finding that there was a mistake that was a basic assumption of the contract. Generally, proving a mutual mistake requires that there be a term of the contract that is premised on a mistaken factual assumption.[77]

---

[73] Pl.'s Opp'n 5–6.
[74] *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 2008 UT 3, ¶ 17, 178 P.3d 886 (quoting *Mooney v. GR & Assocs.*, 746 P.2d 1174, 1178 (Utah Ct. App. 1987)).
[75] *Hatch v. Bastian*, 567 P.2d 1100, 1102 (Utah 1977); *see also Bergmann v. Bergmann*, 2018 UT App 130, ¶ 14, 428 P.3d 89.
[76] Pl.'s Opp'n 6–7.
[77] *See, e.g., Kendall Ins., Inc. v. R & R Grp., Inc.*, 2008 UT App 235, ¶¶ 17–18, 189 P.3d 114 (upholding trial court's finding of mutual mistake related to value and composition of business, when parties negotiating sale of business

Where there is no such term in the contract, there will be no mutual mistake rendering the contract voidable.[78] For instance, in a contract dispute regarding water rights, the Utah Supreme Court affirmed the trial court's exclusion of evidence regarding return flows to prove mutual mistake, because the contract was silent as to return flows while proving mutual mistake would require "a finding that return flows were so fundamental to the [contract] that their reduction would have made the [contract] unenforceable."[79] Likewise, here, the Settlement Agreement is completely silent on the existence and availability of Hope International's data. Given this silence, there is nothing to suggest that the availability of the data would be fundamental to the parties' understanding of the Settlement Agreement, such that any mistake would relate to a "basic assumption" of the contract.

Second, to the extent that Hope argues that there was a mutual mistake because it had agreed to waive a potential claim of which it was unaware,[80] that argument fails due to the express terms of the Settlement Agreement. In the Settlement Agreement, Hope expressly discharges Net Health of "any and all claims" that Hope "*could, shall or may ever have, own or hold*, based on, related to or by reason of the parties [sic] relationships through and including the date of this Agreement . . . whatever occurring or existing at any time up to and including the

---

relied on automated filing system that was still being updated); *Warner v. Sirstins*, 838 P.2d 666, 669 (Utah Ct. App. 1992) (upholding trial court's finding of mutual mistake when party received double the trade-in value of used car, since he received credit for the trade-in on two separate transactions).
[78] *See, e.g.*, *GeoNan Props., LLC v. Park-Ro-She, Inc.*, 2011 UT App 309, ¶ 12, 264 P.3d 1169 ("But the legal separation of the Leased Property and the Southeast Property was not a basic assumption on which the contract was based. Neither the terms of the lease nor the ability of the parties to enter into a lease that did not include the Southeast Property depended on whether the Southeast Property was included in the legal description of Lot 1.").
[79] *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2020 UT 47, ¶ 73, 469 P.3d 1003.
[80] *See* Pl.'s Opp'n 7 ("This mistake is crucial to the parties' understanding of the claims they were waiving and the benefits they would receive from the settlement."); Pl.'s Mot. for Leave to File Am. Compl. 10–11 (noting that Hope wishes to add a claim for breach of contract for Net Health's transfer of Hope's data without Hope's consent)

date of this Agreement."[81] This included both "known and unknown" claims.[82] In other words, the Settlement Agreement waived "any and all" claims Hope "could" have, which would include any claims of which Hope was unaware at the time the Settlement Agreement it drafted and offered to Net Health was accepted. "All claims" is categorical—it encompasses everything and excludes nothing. Thus, the Settlement Agreement that Hope International prepared allocated risk of any mistake regarding a claim to Hope International. This precludes a finding of a mutual mistake.[83]

Finally, Hope International lacks evidence that the alleged mistake was mutual. Hope argues that both parties were mistaken as to "the fact that the data that is underlying this dispute was under the control of Net Health and would be accessible to Hope after the settlement."[84] There is no evidence that on March 27, the day the contract was formed, that Net Health mistakenly believed it still possessed Hope International's data. Indeed, Net Health earlier had sold the business that held the data, making speculative even the possibility of such a mistaken belief. Hope International's attempt to infer a mistake of fact on the part of Net Health from the fact that counsel for Net Health was not immediately apprised as to how to access the data cannot succeed.[85]

---

[81] Settlement Agreement ¶ 2 (emphasis added).
[82] *Id.*
[83] *See* Rest. 2d Contracts §§ 152, 154; *Blackhurst v. Transam. Ins. Co.*, 699 P.2d 688, 692 (Utah 1985) (holding that no mutual mistake existed as to settlement agreement when both parties assumed the risk regarding medical outcome of victim); *Deep Creek Ranch*, 2008 UT 3, ¶ 18; *Christensen v. Oshkosh Truck Corp.*, 12 F.3d 980, 989 (10th Cir. 1993) (applying Utah law to hold that assumption of risk negates a claim for mutual mistake).
[84] Pl.'s Opp'n 7.
[85] *See* Pl.'s Opp'n 7; Mar. 30 to Apr. 7 Emails 1–2.

## ORDER

IT IS HEREBY ORDERED that Defendant's Motion to Enforce Settlement Agreement[86] is GRANTED. Accordingly, the court DENIES Plaintiff's Motion for Leave to File an Amended Complaint.[87]

Signed August 25, 2023.

BY THE COURT

David Barlow
United States District Judge

---

[86] ECF No. 34.
[87] ECF No. 31.